IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 24, 2009

**TONY A. PHIPPS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Sullivan County**
**No. C53,294     Jon Kerry Blackwood, Senior Judge**

**No. E2008-01784-CCA-R3-PC - Filed October 11, 2010**

The Petitioner, Tony A. Phipps, appeals from the denial of his petition for post-conviction relief. The Petitioner claims (1) that he was denied the effective assistance of counsel at trial because his trial counsel failed to present exculpatory evidence and explore certain theories of defense; (2) that misconduct by the prosecutor denied him the right to a fair trial; and (3) that he is entitled to a new trial based upon newly discovered evidence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Jason R. McClellan, Kingsport, Tennessee, for the appellant, Tony A. Phipps.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On May 31, 2002, a Sullivan County Criminal Court jury convicted the Petitioner, Tony A. Phipps, who was originally charged with the second degree murder of 35-year-old Wallace Ray Williams, of the lesser included offense of voluntary manslaughter. Following the jury's verdict and the trial court's imposition of an eleven-year sentence, the Petitioner filed a motion for new trial. The trial court, acting in its role as thirteenth juror, set aside the voluntary manslaughter conviction and granted the Petitioner a new trial. On August 11, 2004, a second Sullivan County Criminal Court jury convicted the Petitioner of reckless

homicide. The trial court imposed a sentence of ten years' incarceration, and this court affirmed both the conviction and the sentence on direct appeal. After our supreme court denied the Petitioner's application for permission to appeal, the Petitioner filed a timely petition for post-conviction relief on February 16, 2007.

## Trial Evidence

The evidence presented at the Petitioner's trial showed that both the Petitioner and the victim rented rooms in a four-bedroom home on Newborn Road[1] in Kingsport. Other residents in the home included the owner, Sylvia Darnell Lyons, and her sons, Josh Darnell and Jason Sean Christian. Mr. Darnell's girlfriend, Amanda Bortz, also stayed at the residence. According to Ms. Bortz, the Petitioner "occupied the front right bedroom," which was separated from the rest of the house by a flimsy metal door he kept closed with an old coat hanger and wire. Ms. Bortz testified that it was common knowledge within the house that the victim loaned money to the Petitioner. The victim's mother, Linda Williams Miller, confirmed that the Petitioner owed money to the victim. Nevertheless, both women testified that the Petitioner and the victim were friends.

On the evening of September 9, 2001, Ms. Bortz went to a sports bar with the victim and Mr. Christian before going back to the Newborn Road house. At approximately 2:00 a.m., Ms. Bortz witnessed an argument between Ms. Lyons and the victim. She stated that the two argued about money, which was a common theme of all arguments at the house. Ms. Bortz recalled that "the victim got very upset and loud and the argument escalated." According to Ms. Bortz, the Petitioner could hear the entire argument between Ms. Lyons and the victim. During that argument, the victim told Ms. Lyons that he would get the money the Petitioner owed him and pay it to Ms. Lyons. The victim, who "had drank approximately a pitcher and a half of beer[] and . . . was on 'dope,'" then yelled the Petitioner's name, shook his bedroom door, and shouted, "Bring your punk a-- out here. We need to talk."

At that point, the Petitioner, who was "standing next to his bed and aiming the gun toward the bedroom door," shot the unarmed victim. Ms. Bortz stated that the Petitioner shot the victim a second time after the victim stumbled into the Petitioner's bedroom. The Petitioner immediately asked Ms. Lyons to telephone 9-1-1. The victim died shortly after arriving at the hospital. State v. Tony Allan Phipps, No. E2005-00647-CCA-R3-CD, Sullivan County, slip op. at 1-5 (Tenn. Crim. App. April 5, 2006).

---

[1] Throughout the record, the address is spelled Newborn Road, Newbern Road, and Newburn Road. For the sake of consistency, we will use the spelling in our opinion on direct appeal.

## Post-Conviction Hearing

At the post-conviction hearing, Kingsport Police Officer Jason Bellamy testified that upon his arrival to investigate the shooting at the Newborn Road house, he and another officer placed the Petitioner into custody. Officer Bellamy described the Petitioner as "upset" and noted that the Petitioner was arrested without incident. After his arrest, the Petitioner told Officer Bellamy, "I did what I had to do." The Petitioner also told the officer that the victim broke into his room and attempted to choke him. He stated that upon his entry into the Petitioner's bedroom, he observed that the "eye-hook type latch" on the bedroom door was broken. Officer Bellamy stated that he was called as a witness at the Petitioner's first trial but did not recall testifying at the second trial.

Kingsport Police Officer Dennis Hickman testified that he went to the Newborn Road house two days before the shooting to investigate a call made by the Petitioner. Officer Hickman stated that the Petitioner complained that the victim had threatened him as a result of a disagreement over money the Petitioner was holding for Mr. Williams. He said he did not recall that the Petitioner expressed fear of the victim. Officer Hickman stated, however, "I would dare say he did [fear the victim]. Otherwise he would not have called us." Officer Hickman noted that the Petitioner "was pretty matter of fact about it." Officer Hickman said he did not testify at either of the Petitioner's trials.

During cross-examination, Officer Hickman confirmed that although the Petitioner placed his call to police on September 7, 2001, his complaint involved a verbal altercation that occurred on September 4, 2001. Officer Hickman testified that although he offered to speak with the victim as a result of the Petitioner's call, the Petitioner declined the offer. He stated that the Petitioner did not act frightened during their discussion. He also said he advised the Petitioner to call the police if the victim became violent and that the Petitioner said, "[The victim] had not been violent toward him before."

Kingsport Police Detective David Cole, who participated in the investigation of the shooting, testified that he observed that the hanger used to keep the Petitioner's bedroom door closed was broken. He said he was aware that the house was a drug house. Detective Cole testified that trial counsel never interviewed him in conjunction with the case. He admitted that the autopsy of the victim established the victim's blood alcohol level as .088 percent and that the victim had taken diazepam and nordiazepam.

During cross-examination, Detective Cole confirmed that he was present in the courtroom throughout the Petitioner's trial and that evidence that the victim had barged into the Petitioner's bedroom and broken the latch on the door had been presented to the jury at both of the Petitioner's trials. Detective Cole also confirmed that the Petitioner's trial

counsel thoroughly cross-examined the medical examiner regarding the presence of drugs and alcohol in the victim's blood. Upon redirect-examination, Detective Cole stated that he could not recall whether either of the 9-1-1 calls were played for the jury.

Sylvia Darnell Lyons testified that she rented a room to the Petitioner and that the victim lived in the house but did not pay rent because he "was a close friend." She stated that the victim "was fixing to marry [her] daughter but he had a relationship. [Her daughter] was incarcerated in Johnson City." Ms. Lyons recalled that her daughter, Sabrina, was "on the brink of getting out in 2001." According to Ms. Lyons, there was conflict because the Petitioner was corresponding with Sabrina, and Ms. Lyons could feel the conflict because the Petitioner and the victim had been friends for years. Ms. Lyons testified that the Petitioner was "working undercover" during the time he lived in her home.

Ms. Lyons stated that on the day of the shooting, the victim noticed that she was smoking Bronco cigarettes rather than her usual Marlboro Milds and that he inquired if she was experiencing financial trouble. She told him that the Petitioner had not paid his rent, and the victim told her that he was "going to go in there and ask [the Petitioner] for that $200 [the Petitioner was] holding for [him]." According to Ms. Lyons, the victim said, "I ain't going to see you sit here and smoke Bronco cigarettes." Ms. Lyons stated that she implored the victim to "just wait and talk about it in the morning," but the victim refused, saying, "I ain't got much change left either." She said that at that point, the victim yelled for the Petitioner to come into the living room, and that when he did not, the victim said, "Punk, come out here." She said that when the Petitioner did not open the door, the victim went to the door quickly and opened it, and that she walked behind the victim. She said she did not hear the victim say, "Get your punk a– out here." She denied that the victim jerked open the Petitioner's door and said that it would only take two fingers to open it.

Ms. Lyons testified that the Petitioner told her he was afraid of the victim and that she told him she did not think it was good that the Petitioner had not paid his rent and was writing to her daughter. She said she thought the victim did not like the Petitioner's writing to her daughter but that the victim never mentioned it to her other than saying that he found a letter on the kitchen table. She said the Petitioner and the victim "were always friends." She also conceded that the victim was "drinking, he was broke, and [the Petitioner] was writing letters to the person he loved." She acknowledged that after the victim opened the door to the Petitioner's bedroom, the victim stood between the Petitioner and the only exit to the room. She stated that she did not testify at either of the Petitioner's trials.

Thomas King testified that he had known the Petitioner since the late 1970s when the Petitioner began helping Mr. King's brother in their "shop." He said that he "got sick in '99 and everything is kind of a blur since then." Mr. King stated, however, that he recalled the

-4-

Petitioner stating that he was "[p]hysically afraid" of the victim because the victim, who "was a larger man," would "come into [the Petitioner's] room unexpectedly." Mr. King said he did not know the victim and doubted he would have met the victim if the Petitioner and the victim were lifelong friends. He said he did not meet many of the Petitioner's friends. He said he never discussed the case with the Petitioner's trial counsel.

Gerald Charles "John" King testified that he had a stroke but that it did not affect his memory. He said that he and his brother grew up with the Petitioner, who lived in their neighborhood. He stated that he had never heard of the victim, but he then said he knew that the victim and the Petitioner were friends and that he was aware of one occasion when the victim and the Petitioner rode somewhere together. He said he never spoke with trial counsel other than to say hello and that he never testified on behalf of the Petitioner.

Sherry Haynes testified that she had known the Petitioner for more than twenty years and that they were "like brother and sister," "like a best friend kind of a thing." She stated that she lived "maybe a block and a half" from the Petitioner and knew "pretty much all his friends." Despite this, she "never knew" the victim. She said she "never knew of a Ray Williams living in [the] neighborhood." Ms. Haynes testified that she was never interviewed by the Petitioner's trial counsel and that she did not testify at either of the Petitioner's trials.

The Petitioner testified that he provided trial counsel with the names of more than twenty witnesses whose testimony would establish that he and the victim were not best friends and that the victim did not live at the Newborn Road house. He said the discovery provided to him by trial counsel contained "several pieces of powerful exculpatory evidence," such as that he reported to the police that the victim threatened his life and that Ms. Lyons did not want the victim at the Newborn Road house. The Petitioner stated that he told trial counsel about signed receipts showing that he did not owe rent to Ms. Lyons. He said that although he and trial counsel discussed the 9-1-1 recordings, he heard them for the first time during the evidentiary hearing because neither was played for the jury during his trial. He said he was aware during the conviction proceedings that the 9-1-1 recordings existed. He said that he knew the victim was recently arrested for selling morphine and that he wanted counsel to present this evidence.

The Petitioner described the Newborn Road house as "a nightmare" and stated that he "tried not to be there at all." He said he was disabled and had a limited income. He said he did volunteer work at a Goodwill Store and that he tried to stay there eight to twelve hours a day to be away from the house. He stated that he was living with drug addicts who would steal money if he went to the bathroom and that he rented a post office box in which he kept his money. He said he explained his living situation to both Officer Hickman and his trial counsel. The Petitioner stated that he told counsel that he was "scared to death" of the victim

and asked counsel repeatedly when he was going to present proof of his fear of the victim. He said he wanted to testify at trial but counsel told him to "keep [his] mouth shut" because the discovery material established that the Petitioner acted in self-defense. He said he wrote counsel "so many letters . . . giving him information that it just about drove him batty." He said that trial counsel failed to present the witnesses and other evidence he wanted, but he acknowledged that trial counsel protected his Fifth Amendment and Miranda rights. He said he "stood on" these rights after trial counsel explained them to him.

During cross-examination, the Petitioner acknowledged that his counsel "took any and about all" of the telephone calls the Petitioner placed to him. He said counsel did not respond to his letters but that the letters were "letters of information." He stated that although he "begged" counsel to put on evidence to support his self-defense claim, counsel did not do so. The Petitioner admitted that he chose not to testify on the advice of trial counsel. On redirect examination, the Petitioner emphasized that he relied on the advice of his counsel throughout the trial.

Trial counsel testified that he represented the Petitioner in his two trials in 2001 and 2004. He stated that he elicited Officer Bellamy's testimony regarding the victim's breaking the latch on the Petitioner's bedroom door during the first trial. He did not think Officer Bellamy testified at the second trial. He said the evidence did not fit into the defense theory of the case because the latch was a bent coathanger. He said, "I guess you could use it as exculpatory." He said he tried using this defense theory at the first trial and could not really say why the same theory was not pursued at the second trial, but he noted that the State used different witnesses and "the proof came in different" at the second trial.

Trial counsel testified that he interviewed Ms. Lyons on two occasions and that during the interviews "she was not very coherent" and expressed a desire for the Petitioner "to burn in hell." He said she appeared to be under the influence of medication. He said her testimony was more damaging than that of Amanda Bortz and that he did not think Ms. Lyons would be a helpful witness for the defense. As a result, trial counsel chose not to call Ms. Lyons as a witness.

Counsel testified that Amanda Bortz was a favorable witness for the defense. He noted, however, that she was now deceased. He said he did not interview Christy Bishop, whom the victim allegedly assaulted five months before his death.

Trial counsel testified that he did not present evidence that the victim had a record for "going armed" because this did not fit the theory of the case, which involved the unarmed, somewhat intoxicated victim making threats for the Petitioner to get his "punk a–" out of his room. He said he did not want to "give the prosecution an opening for premeditation" even

though the Petitioner had never been charged with first degree murder. He explained that he chose to keep it "low-key."

Trial counsel testified that he chose not to introduce evidence of the victim's past threats to the Petitioner because "that was self serving." He elaborated, "I didn't think [it] was proper . . . because . . . it's almost like him testifying without being sworn and taking the witness stand." He stated that although he was aware that the Petitioner had told John King he was afraid of the victim, he chose not to call John King as a witness because it would have been "self serving." He said he did not believe he could present that evidence because "[t]hat's self serving that he was afraid." Trial counsel acknowledged that he never talked to Thomas King but stated that John King told him that Thomas was sick and unable to talk to him.

Trial counsel testified that he did not ever listen to the 9-1-1 recordings until they were played at the post-conviction hearing. When asked whether he would have used the recordings at trial if he had access to them, he said, "Absolutely not." With respect to his failure to listen to the recordings before trial, he explained, "I didn't feel any need to listen to it because it's all self serving. And I never, at any time, ever thought about putting [the Petitioner] on the witness stand." Counsel recalled,

> We were dealing primarily with the moment of what happened when he went through that door and [the Petitioner was] there with a black powdered pistol, and what was going through [the Petitioner's] mind at that point. Based on 'get your punk ass out here,' which I think was similar to the words that the victim had stated.

He acknowledged that the Petitioner's prior statements of fear of the victim would not be as self-serving if part of an excited utterance theory but stated that he "felt like the way we handled it was the only way." He said that in his opinion, the case was better tried in the first trial, but the result was better in the second trial.

Counsel testified that there were witnesses he could have presented to challenge the State's proof that the Petitioner and victim were "life buddies," had he tactically tried the case in this manner. He said several of these witnesses were subpoenaed but that he saw the friendship as "a collateral issue." Counsel explained, "As to why I didn't do this or didn't do that, my tactics were to bear down on [the Petitioner's] size, things of that nature, because I had a victim that was not armed, had not made a violent threat or . . . anything to indicate bodily harm other than what was in [the Petitioner's] mind."

Trial counsel testified that the Petitioner faced a maximum conviction of voluntary manslaughter at the second trial and that he was concerned about the Petitioner being convicted of that offense, rather than the reckless homicide conviction the Petitioner ultimately received. He said that the Petitioner's "calling the police saying he was afraid, his telling all these people immediately prior to that he was afraid of this man, . . . could play out as intent in premeditation. Not that he was charged [with second degree murder] the second time. But it could create that thought in the minds of the jurors."

Counsel testified that he tried to raise the Petitioner's claim of self-defense "as best [he] could to get [the Petitioner] off or as little as [he] could get by with and be believable." Counsel admitted that self-defense was an affirmative defense that must be supported by proof, but he nevertheless stated that he "had no proof except by cross-examination." He said that based upon information he received from the Petitioner, he determined that the Petitioner should not testify.

During cross-examination, trial counsel acknowledged that the jury was presented with proof that the victim was larger than the Petitioner, was under the influence of alcohol, and made threatening comments just before opening the Petitioner's bedroom door. Counsel described his theory of defense as "[i]mperfect self-defense but self-defense." Counsel stated that he discussed his trial strategy with the Petitioner and that the Petitioner agreed with the strategy. He said that he subpoenaed more than twenty-five witnesses for the Petitioner's second trial but that he did not call any of them to testify on the Petitioner's behalf. He admitted that he had not spoken with Ms. Haynes before the trial even though he had subpoenaed her to be a witness.

At the conclusion of the hearing, the trial court took the petition under advisement. In a detailed written order, the trial court denied relief, concluding that the Petitioner failed to establish by clear and convincing evidence that he had been denied the effective assistance of counsel. The court found that the Petitioner "agreed with counsel that the defense would not call any witnesses." Further, the court concluded that the 9-1-1 tape made on the day of the shooting contained inadmissible hearsay and further revealed the Petitioner's "calm and clear mind that might have negated a self[-]defense theory." The court found that the 9-1-1 tape made three days before the shooting and Officer Hickman's testimony regarding his investigation of that call would have been inadmissible hearsay. The court also found that Officer Hickman's testimony that the Petitioner was calm during the interview "could have allowed the jury to infer that the Petitioner was calm, thus negating self[-]defense." The trial court determined that Officer Bellamy's testimony would have been cumulative to other trial evidence that established that the hinge lock to the Petitioner's bedroom was broken. Finally, the court determined that trial counsel's failure to call witnesses to refute the State's assertion

that the Petitioner and victim were friends or to establish that the Petitioner was current on his rent "was collateral to the self defense theory."

In this appeal, the Petitioner contends that trial counsel was ineffective, that the State engaged in prosecutorial misconduct, and that newly discovered evidence warrants the grant of post-conviction relief. We take judicial notice of the direct appeal record to aid our review of the issues.

**Standard of Review**

The burden in a post-conviction proceeding is on the Petitioner to prove his allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). Once a petitioner establishes the fact of counsel's errors, the trial court must determine whether those errors resulted in the ineffective assistance of counsel. Dellinger, 279 S.W.3d at 293; see Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006).

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within

the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04, (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

## I. Ineffective Assistance of Counsel

The Petitioner claims that trial counsel performed deficiently by failing to call witnesses and introduce evidence in support of his self-defense claim, by failing to explore other defenses, and by failing to present evidence to refute the State's assertion that the Petitioner and the victim were friends. The Petitioner contends that the testimony presented at the evidentiary hearing by Officer Hickman, Sylvia Lyons, Thomas King, and John King, as well as the recording of the 9-1-1 call he made days before the crime, would have been admissible at the trial and should have been presented to establish the Petitioner's fear of the victim. He claims that testimony from Sherry Haynes and the King brothers would have been admissible to rebut the State's proof that the Petitioner and the victim were friends.

### A. Petitioner's Statements of Fear

We consider first the Petitioner claim that trial counsel performed deficiently by failing to present evidence of his statements of fear of the victim made before the crime. Trial counsel testified that he did not believe that the Petitioner's statements of fear would have been admissible because they were self-serving. Each of the statements in question was self-serving in that each was made by the Petitioner and beneficial to the Petitioner's theory of defense. However, no general rule of evidence excludes statements merely because they are self serving. See generally Tenn. R. Evid. 101-1008; Palmer v. Nationwide Mut. Fire Ins. Co., 723 S.W.2d 124, 128 (Tenn. Ct. App. 1986). Instead, most self-serving statements are excluded not solely because they are self-serving but instead because they constitute inadmissible hearsay. See State v. George Glenn Faulkner, No. 01C01-9812-CR-00488, M1998-00066-CCA-R3-CD, Putnam County, slip op. at 11 (Tenn. Crim. App. June 2, 2000) (observing that "such statements constitute hearsay if offered to prove the truth of the matter asserted therein and, like other hearsay evidence, are unreliable").

-10-

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law. Id. at 802. When a statement is admissible under an exception to the hearsay rule, the fact that the statement is also self-serving would not per se bar its admission. See State v. Dotson, 254 S.W.3d 378, 392-93 (Tenn. 2008); State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007). Moreover, "if a defendant's self-serving statement is offered for a purpose other than proving the truth of the matter asserted therein, the statement does not constitute hearsay and will be admissible unless excluded pursuant to some other rule of evidence." George Glenn Faulkner, slip op. at 11 (citing State v. John Parker Roe, No. 02C01-9702-CR-00054, Shelby County (Tenn. Crim. App. Jan. 12, 1998)).

Thus, the fact that the Petitioner's pre-offense statements could be classified as self-serving would not, standing alone, render them inadmissible. The record reflects that each statement qualified as hearsay under the Rules of Evidence, yet counsel made no effort to determine whether the statements would have been admissible pursuant to a hearsay exception.

We must determine whether each of the Petitioner's would have been admissible at the trial. We are mindful that a trial court's ruling on whether a statement is hearsay is a question of law, and the appellate court reviews the issue de novo without a presumption of correctness. Russell v. Crutchfield, 988 S.W.2d 168, 170 (Tenn. Ct. App. 1998). But see Pylant v. State, 263 S.W.3d 854, 871 n.26 (Tenn. 2008) (observing that "this Court continues to believe that questions concerning the admissibility of evidence are reviewed under an abuse of discretion standard").

1. September 7, 2004 9-1-1 Call

We are troubled by trial counsel's admission that during his representation of the Petitioner, he never listened to the recording of the Petitioner's 9-1-1 call made on September 7. Trial counsel heard the tape for the first time at the post-conviction evidentiary hearing. We note as well that counsel's generalized characterization of the Petitioner's pre-shooting expressions of fear as self-serving demonstrated a lack of preparation by trial counsel. This court will defer to the tactical and strategic decisions made by counsel only when the record establishes that the decisions were made after adequate preparation.

The Petitioner insists that the tape recording of the 9-1-1 call made before the shooting would have been admissible under the "business records exception to the hearsay rule." Despite this statement, the Petitioner actually urges admission of the tape recording under

-11-

Tennessee Rule of Evidence 803(8), which allows for the admission of public records and reports despite their hearsay nature. The rule provides:

> Unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness, records, reports, statements, or data compilations in any form of public offices or agencies setting forth the activities of the office or agency or matters observed pursuant to a duty imposed by law as to which matters there was a duty to report, excluding, however, matters observed by police officers and other law enforcement personnel.

Tenn. R. Evid. 803(8). Even if the Petitioner could have established that the 9-1-1 service qualified as a public agency, admission into evidence of any hearsay content of the audio recording must be predicated upon some other hearsay exception. See State v. Julius E. Parker, No. 02C01-9606-CR-00188, Shelby County, slip op. at 8 (Tenn. Crim. App. April 23, 1997). To the extent that the tape recording could be deemed the records of the Kingsport Police Department, Rule 803(8) specifically excludes the records and reports of "police officers and other law enforcement personnel."

Neither does the audio recording qualify for admission pursuant to the business records exception to the hearsay rule. See Tenn. R. Evid. 803(6). That rule "specifically requires that the declarant have 'a business duty to record or transmit' information." Id., Advisory Comm'n Cmts. Because the Petitioner was the declarant of the statements in this case, the recording would not have been admissible under the business records exception.

In addition, the audio recording would not, as many other 9-1-1 calls would, qualify for admission under the excited utterance exception to the hearsay rule. See Tenn. R. Evid. 803(2). An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Officer Hickman's testimony at the evidentiary hearing established that the Petitioner remained calm during both the call and the subsequent interview. Officer Hickman stated that although the Petitioner reported that the victim had threatened him and that he feared for his safety, he did so in a very calm manner. We note that the Petitioner made the call on September 7 about an incident that took place three days earlier, on September 4. At the time the Petitioner provided the statement, he did not exhibit any signs that he "was under the stress of excitement caused by the event or condition," nor did he make any statement that he feared the victim.

The Petitioner also claims that the audio recording qualified for admission under the "state of mind" exception to the hearsay rule. Tenn. R. Evid. 803(3) (exception for "then existing state of mind, emotion, sensation, or physical condition"). This rule allows the admission of "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition" as proof of the "mental state at issue or subsequent conduct consistent with that mental state." Id., Advisory Comm'n Cmts.

In the 9-1-1 tape, the Petitioner asked the 9-1-1 dispatcher to send an officer to his place of employment because he had "a little problem they need to know about." During the conversation, the dispatcher asked, "What's it in reference to?" The Petitioner replied, "Threats and so forth." The dispatcher then asked, "To you?" and the Petitioner said, "Yeah." The Petitioner did not make any statement about being afraid, nor was he agitated or excited. The tape was not admissible as a statement of then existing mental, emotional, or physical condition because the Petitioner did not make a statement relative to his "state of mind, emotion, sensation, or physical condition." See Tenn. R. Evid. 803(3).

## 2. Officer Hickman's Report

The Petitioner asserts that the incident report prepared by Officer Hickman after the Petitioner's September 7 call to 9-1-1 would have been admissible under the public records and reports exception to the hearsay rule. As noted above, this hearsay exception excludes from admission the records and reports of "police officers and other law enforcement personnel." Tenn. R. Evid. 803(8). The incident report does not qualify for admission pursuant to any other exception to the hearsay rule

## 3. Petitioner's Statements to Officer Hickman

Because Officer Hickman testified that the Petitioner remained calm throughout their interview, the statements the Petitioner made to Officer Hickman during the investigation of the 9-1-1 call were not admissible pursuant to the excited utterance exception to the hearsay rule. See Tenn. R. Evid. 803(2). We also reject that the Petitioner's statements to Officer Hickman were admissible under the "state of mind" exception to the hearsay rule. See Tenn. R. Evid. 803(3). The Petitioner told Officer Hickman that the victim threatened him over a disagreement about money, but Officer Hickman could not recall that the Petitioner said he was afraid of the victim. Although Officer Hickman said that based upon the Petitioner's call to the police, he would "dare say" the Petitioner was afraid of the victim, he did not testify about any statement of fear made by the Petitioner. The Petitioner failed to establish that there was any statement he made to Officer Hickman to show his "then existing state of mind [or] emotion" in order to show that he entertained a belief of imminent danger, death, or serious bodily injury to himself. T.C.A. § 39-11-611(a) (self-defense) (2006).

### 4. Petitioner's Statement to Thomas King

The Petitioner claims that his statements to Thomas King that he feared the victim would have been admissible under the state of mind exception to the hearsay rule. Thomas King would have testified that the Petitioner said he was "physically afraid" of the victim. This might have shown the Petitioner's actual belief at the time of the shooting. See Tenn. R. Evid. 803(3). However, there was also proof that trial counsel learned that Thomas King was incapacitated near the time of the trial and was unable to communicate with trial counsel. Given this uncontroverted evidence, the record does not support a conclusion that trial counsel performed deficiently by failing to investigate Thomas King and to call him as a trial witness.

### 5. Petitioner's Statement to John King

John King did not testify that the Petitioner expressed fear of the victim to him. Despite the controverted proof that trial counsel did not interview John King before trial, there was no proof that John would have offered relevant, admissible testimony about the Petitioner's fear of the victim before the crime.

### 6. Petitioner's Statements to Sylvia Lyons

Sylvia Lyons testified at the post-conviction hearing that the Petitioner was afraid of the victim. She also testified that the Petitioner and the victim were "always friends." Trial counsel testified that he did not call Ms. Lyons as a trial witness because she was not coherent, she appeared to be under the influence of medication, and she expressed her desire for the Petitioner "to burn in hell." Ms. Lyons could have offered favorable testimony about the Petitioner's fear of the victim, but her testimony that the Petitioner and the victim were "always friends" would have diminished her testimony about the Petitioner's fear. Trial counsel made a strategic decision not to call her as a witness because he believed her incoherence and her animosity toward the Petitioner would outweigh any benefit. The record does not support a finding that trial counsel was deficient because he chose not to call Ms. Lyons as a witness.

### B. Relationship Between Petitioner and Victim

The Petitioner contends that trial counsel performed deficiently by failing to call Sherry Haynes, Thomas King, and John King to testify to rebut the State's evidence that the Petitioner and the victim were life long friends. Trial counsel testified that he chose not to call these witnesses because he believed that the Petitioner's relationship with the victim was a "collateral issue."

-14-

We are troubled by the proof of counsel's failure to investigate this issue adequately. We cannot agree with trial counsel's assessment that the nature of the relationship between the Petitioner and the victim was collateral to the Petitioner's claim of self-defense. At the trial, the State presented the testimony of the victim's mother that the Petitioner and the victim were life long friends. This proof contradicted the Petitioner's claim that he had reason to fear a physical attack by the victim.

### 1.  Testimony of Sylvia Haynes

Although counsel testified that he subpoenaed Ms. Haynes as a witness, he admitted that he did not interview her before the trial. Testimony from Ms. Haynes that despite her own long-time friendship with the Petitioner, she "never knew" the victim could have called into question the victim's mother's testimony about the Petitioner and the victim's friendship.

### 2.  Testimony of Thomas King

Although Thomas King did not  profess any knowledge of whether the Petitioner and the victim's friendship existed, his testimony that the Petitioner was afraid of the victim and that the victim would come into the Petitioner's room unexpectedly might have been used to challenge the State's proof of the friendship.  As noted above, however, there was proof that Thomas King was incapacitated and unable to communicate with trial counsel before the Petitioner's trial.  Due  to Thomas King's incapacity, the record does not support a conclusion that he could have offered favorable testimony at the trial.

### 3.  Testimony of John King

John King testified at the hearing that he grew up with the Petitioner and that they lived in the same neighborhood, yet he never heard of the victim even though he knew of one time the Petitioner and the victim rode somewhere together.  His testimony might have diminished the State's proof of the Petitioner and the victim's friendship.

### C.  Prejudice

Having concluded that trial counsel performed deficiently by failing to offer relevant, and likely admissible evidence based upon his own misunderstanding of the rules of evidence and his lack of adequate preparation, we must next ascertain whether the failure to offer favorable defense proof undermines confidence in the outcome of his trial.  See Strickland, 466 U.S. at 694.  Our review includes consideration of Sherry Haynes's testimony about the Petitioner's fear of the victim, as well as Ms. Haynes and John King's lack of knowledge of a friendship between the Petitioner and the victim.  We have not considered any of the

-15-

proffered evidence that we have determined was inadmissible, Thomas King's testimony due to the proof of his incapacity, and Sylvia Lyons' testimony based on the proof that trial counsel interviewed her and made a strategic decision not to call her as a witness.

The Petitioner was originally charged with second degree murder and convicted at his first trial of the lesser included offense of voluntary manslaughter. Following the jury's verdict, the trial court, exercising its role as thirteenth juror, concluded that the State had failed to overcome the presumption that the Petitioner killed the victim in self-defense.[2] In its ruling, the trial court noted in the State's favor the fact that the Petitioner and the victim "were close friends and that no prior threats had been made against the [Petitioner] by the [victim]." The trial court granted the Petitioner a new trial on the offense of voluntary manslaughter. Despite being on notice of the importance of the relationship between the Petitioner and the victim and of any prior threats against the Petitioner, trial counsel failed to use the evidence available to him.

We note that the Petitioner's claim of self-defense was borne out to some extent through trial counsel's cross-examination of the State's witnesses. Considering the trial evidence with the addition of the testimony of Sherry Haynes and John King, the record does not reflect that the Petitioner demonstrated a reasonable probability that the outcome of the proceeding would have been different had this defense proof been presented. Although Sylvia Lyons's testimony would have provided proof of the Petitioner's fear of the victim, the value of this testimony would have been negated by her testimony that the Petitioner and the victim were "always friends." Her testimony along with that of John King might have cast doubt on the Petitioner and the victim's having a long friendship, but their testimony was only that they did not know the victim despite their own long-standing friendships with the Petitioner.

The record of the Petitioner's trial reveals a lack of proof that the Petitioner's belief in the need for self-defense was based upon reasonable grounds. See T.C.A § 39-11-611(a)

_____

[2]The trial court concluded that Tennessee Code Annotated section 39-11-611(b) was applicable in this case. At the time of the crime, that subsection provided:

> (b) Any person using force intended or likely to cause death or serious bodily injury within the person's own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

T.C.A. § 39-11-611(b) (Supp. 2001) (amended 2007, 2008, 2009).

(Supp. 2001) ("The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time, and must be founded upon reasonable grounds."). Even if the Petitioner had established through state of mind evidence an actual belief in the danger posed by the victim, he failed to show that the belief was reasonable and, in so doing, failed to establish a claim of self-defense.

We note as well the possibility that the jury could have viewed the Petitioner's pre-shooting expressions of fear as a means of planning and fabricating a self-defense claim. The jury could have concluded that the Petitioner's shooting of the victim was pre-planned and not reckless or negligent.

The Petitioner failed to show that there was a reasonable probability that the result of the proceeding would have been different had counsel utilized the evidence offered by the Petitioner at the evidentiary hearing. The fact remains that the Petitioner shot the unarmed victim even though the victim made no direct threats toward the Petitioner at the time of the shooting. See Tony Allan Phipps, slip op. at 9. Even assuming that the Petitioner effectively negated the State's proof that the Petitioner and the victim were lifelong friends, the evidence of Petitioner's vague statements of fear was not enough to overcome the proof of the Petitioner's actions. See id. Because he has failed to establish that he was prejudiced by his counsel's deficient performance, the Petitioner is not entitled to post-conviction relief on the basis of ineffective assistance of counsel.

## II. Prosecutorial Misconduct

The Petitioner argues that he was denied due process and a fair trial due to prosecutorial misconduct. No claim of prosecutorial misconduct was raised on direct appeal. See Tony Allan Phipps, slip op. This issue is waived. See T.C.A. § 40-30-106(g) (2006) (providing that claims are waived if they could have been, but were not, presented in an earlier proceeding).

## III. Newly Discovered Evidence

The Petitioner states in the statement of the issues portion of his brief that he is entitled to post-conviction relief based upon newly discovered evidence, but he has not identified that newly discovered evidence in his brief or made any supporting argument about why he is entitled to relief. In his amended petition and at the hearing, the Petitioner complained that the items of evidence assessed in section I. above, some of which were not obtained by trial counsel, supported his allegation that trial counsel provided ineffective assistance at trial. We note that the Petitioner did not pursue a writ of error coram nobis

based upon newly discovered evidence as prescribed by Tennessee Code Annotated section 40-26-105. See generally State v. Mixon, 983 S.W.2d 661 (Tenn. 1999).

To the extent that the Petitioner seeks post-conviction relief because counsel failed to discover evidence that he claims supported his self-defense theory, we have explained above why he is not entitled to relief. To the extent that the Petitioner seeks relief as provided by the writ of error coram nobis, this issue was not raised in the trial court, and we will not consider it for the first time on appeal. See, e.g., State v. Adkisson, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994) (providing that issues raised for the first time on appeal are waived); State v. Matthews, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990).

## Conclusion

Because the record supports the denial of post-conviction relief, the judgment of the post-conviction court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE